

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

*Anthony Moscato*
*Assistant U.S. Attorney*

*970 Broad Street, Newark, NJ 07102 Suite 700*
*(973) 645-2752*

May 9, 2019

The Honorable William H. Walls
United States Senior District Judge
Martin Luther King Building
50 Walnut Street
Newark, New Jersey 07102

      United States v. Germaine H. King, et al.
      Criminal Number: 18-379 (WHW)
      Re: United States' Response to Defense Motion

Dear Senior Judge Walls:

Please accept this letter brief in lieu of a more formal submission concerning the Government's response to defendant Daniel K. Dxrams' omnibus motions. For the reasons forth herein, the Government respectfully requests that the Court deny the defense's motion.

## I.     Overview of the Facts

Defendants Germaine H. King ("King"), Daniel Dxrams ("Dxrams"), and their co-conspirators engaged in an illegal debt elimination scheme (the "Scheme"). In furtherance of the Scheme, defendants King, Dxrams, and their co-conspirators made and used false monetary instruments and other fictitious documents in an effort to unlawfully payoff their unlawfully debts. A grand jury returned a Second Superseding Indictment against both defendants, charging (1) King with conspiracy to commit bank and mail fraud and substantive bank fraud charges related to a fraudulent money order scheme (Counts 1 through 4); (2) King and Dxrams with conspiracy to commit mail and substantive mail fraud charges related to a fraudulent cashier's check scheme (Counts 5 through 15); and (3) Dxrams with bankruptcy fraud (Counts 16 and 17)(the "Indictment").

### The Money Order Scheme

Defendant King and Co-Conspirator Melissa Reynolds ("Reynolds") resided together in a residence in Elizabeth, New Jersey (the "Elizabeth Residence").

In May 2014, defendant King obtained a fraudulent money order "template" from another co-conspirator via email. Thereafter, defendant King and Co-Conspirator Melissa Reynolds ("Reynolds") used this fraudulent money order template to create several fraudulent money orders as intended payoffs of their lawful loans and obligations. For example, in May 2014, defendant King and Co-Conspirator Reynolds mailed two fraudulent money orders, in the approximate amounts of $22,260 and $39,585, to a credit union in New York in their unlawful effort to fraudulently discharge two auto loans for their two Mercedes-Benz cars. In May 2014, defendant King and Co-Conspirator Reynolds manufactured a fraudulent $432,000 money order and mailed it to a financial institution that held the mortgage on the Elizabeth Residence. As a result of sending this fraudulent $432,000 money order, defendant King and Co-Conspirator Reynolds tricked the financial institution into erroneously discharging the mortgage on the Elizabeth Residence. In addition, defendant King made and mailed fraudulent money orders in his attempt to fraudulently discharge his credit card debts with The Home Depot and Macy's.

<u>The Luxury Car Scheme</u>

Defendant Dxrams, a resident on Maplewood, New Jersey, is employed as a social worker/investigator with New Jersey's Child Protection and Permanency, a child welfare agency. He operated at least two side businesses: a car rental business and an online auction business.

As part of his car rental business, defendant Dxrams leased high-end luxury cars, including a Rolls Royce and a Bentley. He also leased two Mercedes-Benz cars, and his spouse leased a Mercedes-Benz car ("MB-1," MB-2," and "MB-3"). In total, as of early 2017, defendant Dxrams (together with his spouse's car) was responsible for the monthly payments of five luxury cars.

Beginning in early 2017, after missing monthly payments on certain of his cars, defendant Dxrams sought out the assistance of defendant King. Thereafter, defendant King, defendant Dxrams, and Co-Conspirator Reynolds conspired to make and use fraudulent cashier's checks in their collective efforts to payoff the leases on defendant Dxrams' cars.

In furtherance of the scheme, defendant Dxrams provided payoff information related to several of his cars to defendant King and Co-Conspirator Reynolds. Based on this information, several fraudulent cashier's checks were created and sent to the finance companies for Rolls Royce, Bentley, and Mercedes-Benz in an effort to payoff defendant Dxrams' luxury cars.

On or about March 10 and 15, 2017, after receiving two fraudulent cashier's checks (one for his car and one for his spouse's car), the finance company for Mercedes-Benz sent two letters to defendant Dxrams' home, advising him that the cashier's checks were not accepted. At around the same time, based on a fraudulent $101,000 cashier's check, Bentley released title of

this luxury car to defendant Dxrams.  In late March 2017, defendant Dxrams sold the Bentley to a third party for approximately $82,000.  Defendant Dxrams then deposited a substantial amount of this money into one of his personal bank accounts.  Immediately after depositing this money into his bank account, defendant Dxrams withdrew $25,000 in cash from this account.  Defendant Dxrams then obtained a genuine $25,000 cashier's check from his bank and issued it to defendant King.  Defendant King then deposited this cashier's check into his own bank account.

From in or about February 2017 through in or about June 2017, defendant King, defendant Dxrams, and Co-Conspirator Reynolds conspired to mail and mailed numerous fraudulent cashier's checks to the finance companies for Rolls Royce, Bentley, and Mercedes-Benz, as follows:

| Approximate Date | Victim Leasing Company | Description |
|---|---|---|
| February 27, 2017 | Mercedes-Benz | A fraudulent cashier's check, in the approximate amount of $51,000 for MB-1. |
| February 27, 2017 | Bentley | A fraudulent cashier's check, in the approximate amount of $101,000, for the Bentley. |
| February 27, 2017 | Rolls Royce | A fraudulent cashier's check, in the approximate amount of $300,000, for the Rolls Royce. |
| February 27, 2017 | Mercedes-Benz | A fraudulent cashier's check, in the approximate amount of $112,000, for MB-3. |
| March 9, 2017 | Mercedes-Benz | A fraudulent cashier's check, in the approximate amount of $50,000, for MB-2. |
| April 4, 2017 | Rolls Royce | A fraudulent cashier's check, in the approximate amount of $300,000, for the Rolls Royce. |
| May 2, 2017 | Rolls Royce | A fraudulent cashier's check, in the approximate amount of $300,000, for the Rolls Royce. |
| May 9, 2017 | Mercedes-Benz | A fraudulent cashier's check, in the approximate amount of $53,000, for MB-1. |
| June 21, 2017 | Mercedes-Benz | A fraudulent cashier's check, in the approximate amount of $116,000, for MB-3. |

| Approximate Date | Victim Leasing Company | Description |
|---|---|---|
| June 22, 2017 | Mercedes-Benz | A fraudulent cashier's check, in the approximate amount of $38,000, for MB-2. |

Defendant Dxrams' Bankruptcy Petition

On or about December 11, 2017, defendant Dxrams filed and caused to be filed in the United States Bankruptcy Court in the District of New Jersey a Chapter 7 bankruptcy petition and corresponding forms and schedules (collectively the "Bankruptcy Petition") entitled In re Daniel Kusi, Case No.: 17-34849 (JKS).[1] Defendant Dxrams signed his Bankruptcy Petition under penalty of perjury.

In his Bankruptcy Petition and as a condition of obtaining a "fresh start" under the Bankruptcy Code, defendant Dxrams was truthfully required to answer questions concerning, among other things, his assets and liabilities. The Indictment alleges the following:

| Question | Matter Falsified or Concealed |
|---|---|
| Do you own or have any legal or equitable interest in any firearm? | Defendant Dxrams concealed his ownership and interest in three firearms, namely:<br><br>(1) Sig Sauer P226 .40 caliber handgun;<br><br>(2) Sig Sauer P220X6 .45 caliber handgun; and<br><br>(3) Beretta 92 9mm handgun. |
| Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment. | Defendant Dxrams concealed that on or about November 27, 2017, he commenced a lawsuit in federal court in the District of New Jersey, demanding approximately $74,000 from a defendant. (17-12038)(JMV-JBC).<br><br>Defendant Dxrams concealed that on or about November 27, 2017, he commenced a second lawsuit in federal court in the District of New Jersey, demanding approximately $75,000 from another defendant. (17-12040)(NLH-JS). |

---

1. In November 2017, defendant Dxrams legally changed his name to "Daniel Kusi."

| Question | Matter Falsified or Concealed |
|---|---|
| Describe Employment, including self-employed work and spouse's work. | Defendant Dxrams concealed his self-employment with his car rental service and his spouse's employment with the State of New Jersey. |
| What is your current marital status? | Defendant Dxrams falsely claimed that he was "not married." |
| Did you have any income from employment or from operating a business during this year (2017) or the two previous calendar years (2016 and 2015)? | Defendant Dxrams concealed that he operated a business and derived gross income from a business in 2017. In truth and in fact, defendant Dxrams operated a car rental business and earned at least $32,000 in gross receipts or sales from his operation of this business in 2017.<br><br>Defendant Dxrams concealed that he operated a business and derived gross income from a business in 2016. In truth and in fact, defendant Dxrams operated a car rental business and earned at least $48,000 in gross receipts or sales from his operation of this business in 2016.<br><br>Defendant Dxrams concealed that he operated a business and derived gross income from a business in 2015. In truth and in fact, defendant Dxrams operated a car rental business and earned at least $4,000 in gross receipts or sales from his operation of this business in 2015. |
| Did you receive any other income during this year (2017) or the two previous calendar years (2016 and 2015), including money collected from lawsuits? | Defendant Dxrams concealed that in 2017 he received income and deposited approximately $105,000 into his individual Wells Fargo bank account, including approximately $76,000 from the sale of the Bentley.<br><br>Defendant Dxrams concealed that in 2016 he received income and deposited approximately $52,000 into his individual Wells Fargo bank account, including approximately $7,361.88 resulting from a personal injury lawsuit he commenced in Middlesex County, New Jersey. |

| Question | Matter Falsified or Concealed |
|---|---|
| Within one year before filing for bankruptcy, were you a party in any lawsuit? | Defendant Dxrams concealed that on or about November 27, 2017, he commenced a lawsuit in federal court in the District of New Jersey, demanding approximately $74,000 from a defendant. (17-12038)(JMV-JBC).<br><br>Defendant Dxrams concealed that on or about November 27, 2017, he commenced a second lawsuit in federal court in the District of New Jersey, demanding approximately $75,000 from another defendant. (17-12040)(NLH-JS). |
| Within 2 years before filing for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs? | Defendant Dxrams concealed his sale and transfer of the Bentley in or about March 2017 for approximately $82,000.<br><br>Defendant Dxrams concealed his transfer of approximately $25,000 to defendant King on or about March 30, 2017. |
| Within 4 years before you filed for bankruptcy, did you own a business or have a connection to any business as a sole proprietor or self-employed in a trade, profession, or other activity, either full time or part time? | Defendant Dxrams concealed that he operated a business, namely, a car rental business, in 2015, 2016, and 2017. |

II.     Argument

In response to the arguments contained in defendant Dxram's motion, the Government replies as follows:

    A.    The Government's Use of Certifications to Introduce Business Records is Proper

In his brief, counsel for defendant Dxrams suggests that he may object to the admission of business records at trial. (Def. Br. at 5).  During trial, the Government intends to introduce into evidence business records from banks, a phone company, and an internet service provider against defendants King and Dxrams.  These bank records are relevant for several reasons.  For example, these bank records establish that defendant Dxrams, after fraudulently obtaining title to a Bentley in furtherance of the conspiracy alleged in Count Five of the Indictment, sold the Bentley to a third party.  Defendant Dxrams then deposited the proceeds from this sale into one of his bank accounts and then issued a genuine a $25,000 cashier's check to defendant King.

Defendant Dxrams' bank records are also relevant to the bankruptcy fraud charges contained in Counts 16 and 17 of the Indictment.  For example, records from his multiple individual and business bank accounts demonstrates that defendant Dxrams made numerous false statements and concealed facts on his bankruptcy petition and corresponding schedules, including his operation of a business, income generated by that business, and income derived from other sources, among other things.

The Government further intends to offer telephone transaction records (non-content) related to two phone numbers used by defendant Dxrams.  These records establish numerous contacts between defendants Dxrams and King during the time period alleged in the Count 5 conspiracy.

The Government also intends to offer certain business records from Google to establish and authenticate emails sent between defendant King and Co-Conspirator Reynolds.  In each instance, in lieu of numerous custodian-witnesses, the Government intends to rely on certifications consistent with Federal Rule of Evidence 902(11) to admit these business records[2] into evidence.

---

    2.    Federal Rule of Evidence 803(6) provides for the admissibility of business records when the records: (1) were "made at or near the time" by "someone with knowledge"; (2) were "kept in the course of a regularly conducted activity of a business"; (3) the "making the record was a regular practice of that activity"; (4) "all these conditions are shown by the testimony of the custodian . . . or by a certification that complies with Rule 902(11)"; and where (5) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6); *see also United States v. Brown*, 834 F.3d 403, 433–34 (3d Cir. 2016); *United States v. Bansal,* 663 F.3d 634, 666 (3d Cir. 2011).

7

Rule 902(11) states the following, in substance and in part:

> Certified Domestic Records of a Regularly Conducted Activity. The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court.  Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them.

*Id.*  In summary, Rule 902(11) states that a business record is admissible as a self-authenticating document if it is accompanied by a certification of the custodian, the proponent gives an adverse party reasonable written notice of the intent to offer the record, and the proponent makes "the record and certification available for inspection—so that the party had a fair opportunity to challenge them." Fed.R.Evid. 902(11).

Here, consistent with Rule 902(11), the Government has provided counsel for defendant Dxrams and defendant King, *pro se*, with the certifications (Wells Fargo, TD Bank, Bank of America, AT&T, Google, Affinity Federal Credit Union, Atlantic Stewardship Bank, and others), and these certifications each comply with the rule.  Furthermore, the Government has provided written notice to the defense that it intends to rely on certifications to offer business records.  Finally, the underlying business records and certifications have been made available to the defense for inspection.  Accordingly, the Government submits that these business records should be admitted by way of certification.

    B.    <u>Defendant Dxrams' Motion in Limine to Exclude Evidence</u>

        1.    <u>Defendant Dxrams' Auto Lease Applications Are Admissible</u>

Defendant Drams' seeks the exclude "any alleged fraud in the application process" related to his lease of several high-end luxury cars. (Def. Br. at 6). Defendant Dxrams applied for four auto leases, as follows: (1) Bentley Continental GT (2012); (2) Mercedes-Benz C300W4 (2015)(MB-1); (3) Mercedes-Benz S550V4 (2016)(MB-3); and (4) Rolls Royce Wraith Coupe (2016).  In addition, defendant Dxrams' spouse leased a Mercedes-Benz C300W4 (2015) (MB-2).

The evidence at trial will establish that defendant Dxrams, defendant King, and Co-Conspirator Reynolds conspired to fraudulently payoff these luxury cars so defendant Dxrams could own them outright.  As part of the scheme, they made and mailed fraudulent cashier's checks and other

fraudulent documents to the companies that provided the financing for the cars. At trial, the Government intends to offer into evidence the auto lease applications related to each of the five cars (collectively the "Lease Applications").

Federal Rule of Evidence 401 defines relevant evidence as having "*any tendency* to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. Rule Evid. 401 (emphasis added); *see Old Chief v. United States,* 519 U.S. 172, 178 (2007)(citing Rule 401). The "any tendency" language of Rule 401 relevance is very easy satisfied. *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009)("Rule 401 does not raise a high standard" and evidence "is irrelevant only when it has no tendency to prove a consequential fact" (internal quotation marks omitted)). In *Huddleston v. United States*, 485 U.S. 681, 687 (1988), the Court noted that Rules 401 and 402[3] embody "the broad principle that relevant evidence—evidence that makes the existence of any fact at issue more or less probable—is admissible unless the Rules provide otherwise."

Here, the Lease Applications establish that (1) defendant Dxrams (and his spouse) leased the cars subject to the Scheme, thus probative of his connection to the Scheme and membership in the conspiracy; (2) he had lawful obligations to pay the leases and the Scheme's goal was to eliminate these obligations, thus probative of his fraudulent intent and knowing participation in the conspiracy; and (3) he personally and financially benefitted and stood to benefit through the Scheme by obtaining and attempting to obtain title to the cars.[4] Furthermore, certain evidence related Rolls Royce, the Bentley, and the Mercedes-Benz cars were found in defendant King's and Co-Conspirator Reynolds' home during the execution of a lawful search warrant. Accordingly, the Lease Applications are highly relevant to the charges pertaining to the Scheme. The Lease Applications provide both direct and circumstantial evidence of defendant Dxrams' knowingly participation in the Count 5 conspiracy and the substantive mail fraud offenses (Counts 6 through 15) and his specific fraudulent intent, an essential element of each count.[5]

---

3. Rule 402 expressly provides that all "[r]elevant evidence will be admissible unless the rules of evidence provide to the contrary." *United States v. Sriyuth*, 98 F.3d 739, 745 (3d Cir.1996) (citations omitted).

4. As part of the scheme, defendant Dxrams and his co-conspirators mailed a fraudulent $101,000 cashier's check to Bentley, resulting in defendant Dxrams fraudulently obtaining title to the car. Thereafter, defendant Dxrams sold the Bentley for approximately $82,000 and then kicked back $25,000 to defendant King.

5. While the Government submits that this evidence provides direct evidence of the charged crimes, the Government provides notice that, in the alternative, it will seek to introduce this evidence under Rule 404(b) as motive, preparation, and plan to commit the fraud.

    Moreover, defendant Dxrams' interest in the Bentley, Rolls Royce, and MB-3 are directly relevant to the bankruptcy fraud charges set forth in Counts 16 and 17.  On his bankruptcy petition, defendant Dxrams' listed the Royce Rolls and MB-3 as debts in his bankruptcy petition.  Moreover, defendant Dxrams' concealed his sale and transfer of the Bentley, which transfer occurred in March 2017, during his bankruptcy proceedings.  For example, the Indictment alleges that:

- "Defendant Dxrams concealed that in 2017 he received income . . . including approximately $76,000 from the same of the Bentley." (Indictment, Count 15, Paragraph 7f); and

- "[The defendant] . . . made a false oath . . . by falsely swearing under oath that his Bankruptcy Petition . . . was accurate and that he had not transferred anything of value to any person in the last two or three years. . . ." (Indictment, Count 16).

Defendant Dxrams' interest in these cars, especially the Bentley, are directly relevant to the bankruptcy fraud charges.  Because the Government must establish that defendant Dxrams leased and then sold (i.e., transferred) the Bentley, evidence that he leased the Bentley is highly probative to establish the falsity of certain representations on defendant Dxrams' bankruptcy petition.  Accordingly, the Lease Applications are relevant.

    Furthermore, the Lease Applications are not inadmissible under Rule 403.  Rule 403 states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed.R.Evid. 403.  When determining whether evidence violates Rule 403, district courts must balance the probative value of the evidence against its prejudicial effect and set forth its reasoning on the record.

    Here, the probative value of the Lease Applications is not substantially outweighed by any of the dangers set forth in Rule 403.  The fact that defendant Dxrams applied for and obtained leases for high-end cars does not constitute unfair prejudice.  On balance, the compelling probative value of the Lease Applications is not substantially outweighed by any prejudice arising from the admission of this evidence, especially considering that these cars are essential components of the charged Scheme.

    The Government recognizes that defendant Dxrams falsely inflated his income on the Rolls Royce lease obtained in March 2016, claiming he earned over $1.2 million in income.  He also submitted a fictitious Form W-2 as part of the lease application, again lying about his income.  While all the lease applications, including the Rolls Royce application, are relevant, as described

10

above, the Government will redact the income section on the Rolls Royce application and will not admit the phony Form W-2 into evidence during the Government's case-in-chief. If, however, defendant Dxrams opens the door to the admission of this evidence, then the Government reserves the right to introduce this evidence. Finally, if defendant Dxrams elects to testify, then the Government will use his fraudulent acts and false statements to impeach him. See Fed.R.Evid. 608(b).

### 2. Defendant Dxrams' Income is Relevant

Defendant Dxrams seeks to preclude reference to defendant Dxrams' income, claiming "it gives the impression that [defendant Dxrams], . . . a state employee, could not afford the subject vehicles unless he was engaging in some type of illegal activity." (Def. Br. at p.10). This argument misses the mark. Defendant Dxrams' income is directly relevant to the bankruptcy fraud charges contained in Counts 16 and 17 of the Indictment.[6]

At trial, the Government intends to offer financial transactions conducted between 2015 through 2017 through multiple bank accounts (individual and business) solely owned and controlled by defendant Dxrams. These financial transactions, such as cash deposits and withdrawals, establish evidence directly related to the bankruptcy fraud counts. Specifically, the Government must establish that defendant Dxrams owned and operated a business during the prior four years preceding his bankruptcy application; he derived income from the operation if his business in 2015, 2016, and 2017; and he derived income from other sources in 2015, 2016, and 2017.

Counts 16 and 17 charge defendant Dxrams with bankruptcy fraud related to his concealment of business income and other income.[7] Count 16 charges defendant Dxrams with "knowingly conceal[ing], . . . falsif[ying], and

---

6. During the timeframe alleged in the conspiracy (between February through July 2017), defendant Dxrams experienced difficulties in keeping up with certain of his lease payments. Such evidence during the charged conspiracy is relevant in assessing defendant Dxrams' knowing and intentional entrance and participation in the conspiracy. This evidence also bears on his intent to defraud, an essential element of the specific intent crimes alleged in Counts 5 through 15. Finally, his failure to make timely lease payments (again during the conspiracy) is probative of his motive to enter the conspiracy and engage in fraud. Accordingly, to the extent that such evidence is admissible under Rule 404(b), the United States gives notice of its intent to use such evidence to establish motive.

7. Count 16 alleges that defendant Dxrams made false statements and concealed facts related to the following questions on his bankruptcy petition: "Did you have any income from employment or from operating a business during this year (2017) or the two previous calendar years (2016 and 2015)?" and "Did you receive any other income during this year (2017) or the two previous calendar years (2016 and 2015), including money collected from lawsuits?"

[making] false entries in [his bankruptcy petition] . . . with the intent to impede . . . [a bankruptcy proceeding] . . . .[i]n violation of Title 18, United States Code, Section 1519 and 2. (Indictment, Dkt# 83, at p. 22). The Government must prove that defendant Dxrams knowingly acted. *See United States v. McQueen*, 727 F.3d 1144, 1151-52 (11th Cir. 2013)(requiring the prosecution to prove "knowingly" alter, destroy, mutilate, conceal, cover up, falsify, or make a false entry).

The defense's claim that the Government intends to offer this evidence to establish that defendant Dxrams engaged in some type of illegal activity is inaccurate. The Government intends to offer this evidence to establish defendant Dxrams' guilt to bankruptcy fraud. For these reasons, the defense's motion to exclude evidence of defendant Dxrams' income should be denied.

### 3.    The Defendant's Various Real Surnames are Admissible

The defense seeks to exclude reference to defendant Dxrams' use of "also known as ("a/k/a") names—i.e., the surnames "Dxrams" and "Kusi." The defense's motion should be denied for the reasons set forth below.

Use of an alias is permissible if it serves the useful purpose by either identifying the defendant or protecting him or her from double jeopardy. *See United States v. Beedle*, 463 F.2d 721, 725 (3d Cir. 1972)(citations omitted). "Even if prejudicial . . . aliases and nicknames are proper in an indictment where they will be part of the government's proof at trial." *United States v. Persico*, 621 F.Supp. 842, 861 (S.D.N.Y. 1988). If a defendant's alias does not "in itself connote criminality . . . there is no risk the alias might unfairly prejudice [the defendant]." *United States v. Vazquez*, 2008 WL 756071, at n.1 (E.D. Pa. 2008)(citation omitted)(not reported).

Here, the names "Dxrams" and "Kusi" are not "also known as" names or aliases. Rather, these names are his real surnames, and he used each name during his commission of the crimes set forth in the Indictment.

In November 2017, defendant Dxrams legally changed his name to "Daniel Kusi." Before November 2017, defendant Dxrams leased the cars subject to the Scheme, opened bank accounts, and completed other relevant acts, all using the name "Dxrams." After changing his name to "Kusi" in November 2017, defendant Dxrams filed for bankruptcy, opened bank accounts, and completed other relevant acts, all using the name "Kusi."

The Government neither alleges nor intends make any claim that defendant Dxrams changed his name for any illicit or improper purpose. Instead, the Government intends to introduce evidence of his name to (1) establish that defendant Dxrams and Kusi are the same person; (2) identify him as the petitioner on the bankruptcy petition and during his bankruptcy hearing (charged as bankruptcy fraud in Counts 16 and 17 of the Indictment);

12

and (3) establish that certain evidence (*e.g.*, bank accounts and other documents in the name Kusi) are associated with defendant Dxrams (and vice versa). Without evidence that defendant Dxrams and Kusi are the same person, the jury would be left with the false impression that the crimes alleged in the Indictment were committed by two different people: one on trial and one not.

> C. The Government's Use of Summary and Demonstrative Charts is Proper

Defendant Dxrams argues that certain summary charts are not relevant and/or constitute inadmissible hearsay. (Def. Br. at p. 12). The defense contends that "no relevant basis for the introduction of 'evidence' from 2015 or 2016 [is present] since these years predate the alleged fraud." (*Id.*). For the reasons set forth below, the defense's motion should be denied.

During trial, the Government will seek the admission of certain summaries under Rule 1006 and demonstrative charts under Rule 611(a). The documentary and digital evidence in this case is voluminous. Summary charts will help synthesize thousands of documents of financial transactions, phone records, and other similar records for the jury's consideration.

Defendant Dxrams mistakenly concludes that evidence from 2015 and 2016 is not relevant and constitutes inadmissible hearsay. This evidence is directly probative of the bankruptcy fraud charges alleged in Counts 16 and 17 of the Indictment. Count 16 charges defendant Dxrams with knowingly concealing, covering up, falsifying, and making false entries in his bankruptcy petition and corresponding forms and schedules. More specifically, Count 16 alleges that defendant Dxrams had income from operating a business during 2017, 2016, and 2015, which income he concealed during his bankruptcy proceeding. Count 17 charges defendant Dxrams with making a false oath during the course of his bankruptcy proceeding. During trial, the Government intends to introduce evidence from defendant Dxrams' bank accounts and other financial disclosures that demonstrates the he operated a business between 2015 and 2017 and derived income from the operation of the business, contrary to the representations he made on his bankruptcy petition and during his bankruptcy proceeding. Therefore, this evidence is highly relevant and provides direct evidence of the bankruptcy fraud. Because this evidence consists of statements made by defendant Dxrams (Fed.R.Evid 801(d)(2)) or bank records (Fed.R.Evid 803(6)), such evidence is either not hearsay or an exception to the hearsay rule.

The Government intends to use summary charts under Rule 1006 and demonstrative charts under Rule 611(a) to present voluminous financial evidence and other types of evidence. The Government sets forth the legal analysis pertaining to Rule 1006 and Rule 611(a).

### 1. Summary Charts under Rule 1006

The Government intends to admit certain summary charts under Rule 1006 into evidence at trial. The Government has complied with Rule 1006 by giving notice and making the underlying records available for defense inspection. Furthermore, the Government has provided the charts to the defense.

Rule 1006 governs the admission of summary evidence and states the following in pertinent part:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writing . . . that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place.

Fed.R.Evid. 1006. Courts have recognized that "it often takes a great deal of court time to introduce a legion of documents to establish a single point" and, because "it would be a grueling waste of time to examine all of underlying evidence in court . . . charts and summaries are permitted within the court's discretion." *United States v. Bertoli*, 854 F. Supp. 975, 1050 (D.N.J. 1994), *rev'd on other grounds*, 40 F.3d 1384 (3d Cir. 1994)(quoting *United States v. Strissel*, 920 F.2d 1162, 1163-64 (4th Cir. 1990)). "[C]ourts cannot rationally expect an average jury to compile summaries and to create sophisticated flow charts to reveal patterns that provide important references about the defendants' guilt." *Id.* (internal quotation marks and citation omitted); *see also Mulholland v. Hoffer*, 2007 WL 1276915, at *9 (E.D. Pa. Mar. 1, 2007) (admitting summary chart of medical records showing medical treatments related to accident); *In re Ski Train Fire in Kaprun, Austria*, 2006 WL 538200, at *4 n.50 (S.D.N.Y. Mar. 6, 2006).

Under Rule 1006, summary charts are admissible when the following conditions are satisfied:

> (1) The underlying documents must be admissible, even if they are never admitted; (2) the underlying documents must be too voluminous for convenient in-court review; (3) the charts must accurately summarize the underlying documents; (4) the summary charts and the underlying documents must have been made available at a reasonable time and place for inspection by the opposing side; and (5) the person who prepared the charts must have been made available for cross examination.

*Bertoli*, 854 F. Supp. at 1050 (citations omitted). A witness who supervised the summary chart's preparation or carefully reviewed its content may establish the "authenticity and accuracy" of the summary. United States v. Scales, 594

F.2d 558, 563 (6th Cir. 1979). Under Rule 1006, the underlying documents not need to be admitted into evidence as a condition precedent for the admission of Rule 1006 summary charts. *Bertoli*, 854 F. Supp. at 1050. Even if the underlying documents have been admitted into evidence "the use of Rule 1006 summary charts may be appropriate." *Id.* at 1050 n.138. The "determining factor [is] the volume of documents summarized by the chart, not whether the underlying documents had been physically admitted into evidence." *Id.*; *see also United States v. Bansal*, 663 F.3d 634, 668 (3d Cir. 2011) (affirming admission of two summary exhibits derived entirely from other exhibits admitted into evidence).

Furthermore, Rule 1006 "does not require 'that it be literally impossible to examine all the underlying records [before a summary chart may be used], but only that in-court examination would be an inconvenience.'" *Bertoli*, 854 F. Supp. at 1050 (quoting *United States v. Possick*, 849 F.2d 332, 339 (8th Cir. 1988)); *accord United States v. Jennings*, 724 F.2d 436, 441-42 (5th Cir. 1984) (charts were introduced to summarize nearly 200 pages of material).

Finally, a summary chart admitted under Rule 1006 does not need to "accurately reflect all the facts in the case; it merely must accurately represent the facts that it purports to summarize . . . [and] such summaries may present only one party's side of the case." *United States v. Lynch*, 735 Fed.Appx. 780, 786 (3d Cir. 2018)(citing 2 McCormick on Evid. § 241 (7th ed.)). Charts admitted under Rule 1006 are admitted as substantive evidence. *See* n10 infra.

During trial, the Government anticipates that it will introduce numerous summary charts into evidence under Rule 1006. The Government has provided and made available to the defense the underlying voluminous evidence for the charts; has provided the charts as marked exhibits to the defense, and the defense will have the opportunity to cross examine any witnesses who will testify as the proponents of such charts. Accordingly, this Court should permit the use of such charts.

2. Summary Charts under Rule 611(a)

The Government intends to admit into evidence certain demonstrative charts under Rule 611(a). [8]

Because the charts sought to be admitted are actual summaries of admissible evidence, they are admissible pursuant to Rule 1006. In the alternative, however, these charts also meet the requirements of being demonstrative charts pursuant to rule 611(a). In particular, Rule 611(a) provides that:

> [t]he court shall exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to (1) make the those procedures effective for determining the truth, (2) avoid wasting time, and (3) protect witnesses from harassment or undue embarrassment.

The use of demonstrative charts to "aid the jury's comprehension is well within the court's discretion." *Possick*, 849 F.2d at 339 (citing Fed. R. Evid. 611(a)). When a party uses Rule 611(a) charts, "a number of courts considering the issue have developed safeguards to minimize possible prejudice to a defendant by (1) ensuring that the individual who prepared the chart – as

---

8. As one court explained, the difference between Rule 611 and Rule 1006 charts is as follows:

> [T]here is a distinction between a Rule 1006 summary and a so-called "pedagogical" summary. The former is admitted as substantive evidence, without requiring that the underlying documents themselves be in evidence; the latter is simply a demonstrative aid which undertakes to summarize or organize other evidence already admitted . . . . [A] pedagogical summary can itself be admitted into evidence where the trier of fact will find it helpful and will not be unduly influenced thereby.

*White Indus. v. Cessna Aircraft Co.*, 611 F. Supp. 1049, 1069-70 (W.D. Mo. 1985) (citations omitted).

well as the evidence upon which the preparer relied – was available for cross-examination by the defendant to test the competence of the evidence as presented in the summary chart, and, (2) ensuring that the district court properly instructed the jury concerning the manner in which they were to consider the charts." *Johnson*, 54 F.3d at 1159 (citations omitted).

Numerous courts of appeals have affirmed a district court's admission of demonstrative charts into evidence under Rule 611(a). *See United States v. Johnson*, 54 F.3d 1150, 1160 (4th Cir. 1995)(holding that summary charts could be admitted under Rule 611(a) where trial lasted seven days and over thirty witnesses were called); *United States v. Paulino*, 935 F.2d 739, 752 (6th Cir. 1991)(admitting charts under Rule 611(a)); *United State v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988) (holding that it was not an abuse of discretion to admit summary charts where ten week trial involved numerous witnesses and voluminous evidence). Finally, the Government may introduce these charts either through a person who prepared the chart or a person who has reviewed the underlying documents and confirmed the accuracy of the particular chart. *See Bertoli*, 854 F. Supp. at 1055 (citations omitted).

During trial, the Government anticipates that it will introduce numerous summary charts into evidence under Rule 611(a). The Government has provided and made available to the defense the underlying voluminous evidence for the charts; has provided the charts as marked exhibits to the defense, and the defense will have the opportunity to cross examine any witnesses who will testify as the proponents of such charts. Accordingly, this Court should permit the use of such charts.

### III.  Conclusion

For the reasons set forth above, the United States respectfully requests that the Court deny the defense's motion in toto.

Respectfully submitted,<br>
CRAIG CARPENITO<br>
United States Attorney<br>
<br>
s/ Anthony Moscato

By:   Lakshmi Srinivasan Herman
      Anthony Moscato
      Assistant U.S. Attorneys

cc:   Michael Orozco, Esq.
      Germaine H. King, *Pro Se*
      Kenneth W. Kayser, Esq.