**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

*Lakshmi Srinivasan Herman*
*Anthony Moscato*
*Assistant U.S. Attorneys*
*(973) 645-3985/2752*

December 19, 2019

The Honorable John Michael Vasquez
United States District Judge
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07101

Re: United States v. Daniel K. Dxrams
Criminal Number: 18-379 (JMV)
United States' Response to Defense Motion For a New Trial or a Judgment of Acquittal

Dear Judge Vasquez:

Please accept this letter brief in lieu of a more formal submission concerning the Government's opposition to Defendant Daniel K. Dxrams', a/k/a "Daniel Kusi," a/k/a Danny D. Dxrams" (the "Defendant" or "Kusi" or "Dxrams") motion for a new trial under Federal Rules of Criminal Procedure ("Fed. R. Crim. P.") 33, or, alternatively for a judgment of acquittal pursuant to Fed. R. Crim. P. 29.[1] The Defendant also seeks to set aside the jury's guilty verdict, erroneously claiming that co-defendant Germaine H. King's ("King") alleged "prejudicial" trial testimony led to an unfair trial.

For the reasons forth herein, the United States respectfully requests that the Court deny the Defendant's motion and proceed with the sentencing on January 7, 2020.

1. The Government incorporates by reference its arguments in opposition to the Defendant's initial Rule 29 motion made at the close of the Government's case-in-chief. *See* June 13, 2019 Tr. at 7:20 – 48-11. The Defendant did not renew his motion at the close of all the evidence. The Court ruled in the Government's favor as to all of the counts against the Defendant, *see id.* at Tr. 42 at 8-11; Tr. 48 at 8-11, and reserved as to Count 5 against King, *see id.* at 20:17-18. The Court ruled in the Government's favor as to Count 5 against King at the conclusion of all the evidence.

## Overview

The jury convicted the Defendant and King after an approximate five-week trial. The evidence at trial presented overwhelming evidence of each defendant's guilt beyond a reasonable doubt, as reflected by the jury's verdict. The evidence included (1) testimonial evidence, including testimony from three experts; (2) documentary evidence, including highly incriminating evidence lawfully seized from King's home; (3) financial and banking records and transactions; and (4) unassailable digital evidence, including files and documents located on King's home computer and emails between King and other co-conspirators. In addition, the Defendant was also convicted for his role in a blatant bankruptcy fraud scheme, wherein he made false statements about and concealed information concerning his assets and income, including his ownership of a cash business, his receipt of large amounts of cash derived from this business and a lawsuit, his ownership of firearms, and even his marital status. Furthermore, he was charged with and convicted of lying to a bankruptcy trustee while under oath.

The Defendant presented a "lack of intent" defense; namely, that King and Reynolds duped and tricked the Defendant into believing the debt elimination scheme was legitimate. The Government met this defense head on during the Government's case-in-chief and presented both direct and circumstantial evidence that the Defendant knew (*i.e.*, that he had the specific intent), at the time he agreed to participate in the scheme, that it was all a fraud, as more fully described below. After the Government rested, both the Defendant and King testified. In the Government's view, the Defendant's testimony was riddled with inconsistencies and half-truths and was generally incredulous. By testifying, the Defendant gave the jury the ability to weigh his lack of intent defense—and the jury flatly rejected it.

Moreover, as an apparent matter of trial strategy, the Defendant expected that the evidence against King would bolster the Defendant's lack of intent defense. That evidence, ostensibly from the Defendant's perspective, included evidence that King was persuasive, charismatic, deceitful, and a dyed-in-the-wool fraudster. It is for these reasons that neither before nor during trial did the Defendant file a motion to sever or object to King's testimony. In fact, the Defendant extensively cross-examined King.

Based on all the evidence, the jury rejected the Defendant's defense. At the conclusion of the Government's case, the Defendant made a motion under Rule 29. The late Hon. William H. Walls denied that motion. For the same reasons, and as set forth below, the Defendant's motion should be denied. This Court should also deny the Defendant's motion for a new trial under Rule 33. The jury's verdicts were not against the weight of the evidence, and there were no trial errors that individually or collectively denied him a fair trial.

This Court should also deny the Defendant's motion to set aside the jury's guilty verdicts because King's trial testimony did not lead to an unfair trial. The Defendant failed to argue for a severance pretrial, did not object to King's testimony, and thus waived such untimely arguments.

<u>The Evidence Adduced at Trial</u>

<u>A. The Scheme to Defraud</u>

King and Melissa Reynolds ("Reynolds") were the ringleaders of a fraudulent debt elimination scheme.[2] PSR, at ¶ 29. The object of the scheme was to unlawfully discharge lawful debts, such as mortgages, car leases, and credit card bills, and to fraudulently obtain money and property. *Id.*, at ¶ 25. These defendants and their co-conspirators used fraudulent monetary instruments—*i.e.*, money orders and cashier's checks—in their effort to discharge their lawful debts.

In or about early 2017, the Defendant joined the scheme. *Id.*, at ¶ 29, 78. At the time, the Defendant was responsible for the payment of five luxury cars—a Rolls Royce, Bentley, and three Mercedes-Benz. *Id.*, at ¶ 75. While he was experiencing difficulty in making the large monthly payments on his many cars, Dxrams and King discussed a way in which King and Reynolds could pay off Dxrams' car so he could own them outright. *Id.*, at ¶ 78. Thereafter, King, Reynolds, and the Defendant agreed to make and use cashier's checks in their attempt to pay off and own outright the Defendant's luxury cars. *Id.*, at ¶ 79. The Defendant knew the these cashier's checks were being created on King's and Reynolds' home computer. *Id.* The Defendant also knew the no legitimate funds backed these cashier's checks. He testified as follows concerning a meeting the Defendant had with King and Reynolds in their basement:

> Q. . . . . What happened next – did you have a discussion with them [King and Reynolds]?
>
> A. Yes. So I asked Mr. King, like, you asked me to come here, What's up?
>
> Q: He said, Oh, yes. I just wanted to let you know that Melissa has her own private estate, and has her own private account that she is authorized to pay off debts.

* * * *

2. Because the Presentence Investigation Report ("PSR") provides an overview of the evidence adduced at trial, the Government will cite to the PSR, together with trial transcripts where appropriate.

A: So, she show me the check, and I saw that her name was on the check, and it says Melissa Shawn, kin of Reynolds, on the check. And the check also says, United States Department of Treasury. So when I saw that, I thought this was legit because she has the personal information on the check. Nobody puts their personal information on the check [a reference to Reynolds social security number on the check used in lieu of an account number] with the U.S. Government information on it. *So I thought that was legit*.

Testimony of Defendant, Transcript, June 13, 2019, at pp. 122, 124, Lines 18-25, 1-9 (emphasis added). Although the Defendant claimed he believe that the homemade cashier's checks were legitimate, his own testimony revealed the sheer outlandish nature of the fraud:

Q. Did they [King and Reynolds] make any representations to you with regards to the process by which these checks were sent out?

A. Yes, Melissa did.

Q. What was the process that was explained to you?

A. She explain to me that they sent three checks out for each car; one goes to Puerto Rico IRS office, the other one goes to their bank and the other one goes to the U.S. Treasury office.

Testimony of Defendant, Transcript, June 14, 2019, at p. 11, Lines 13-20. The Defendant acknowledged that he provided the payoff information related to certain of his luxury cars to King and Reynolds. *Id.*, at p. 16, Lines 4-10.

Although the Defendant claimed he believed the checks and the process were legitimate, his testimony was directly contradicted by an employee from a Bentley dealership. This witness testified about a conversation he had with the Defendant that related to the sale of the Bentley. This witness testified as follows:

Q. And did there come a time when you had a conversation with Mr. Dxrams about a payoff?

A. Yes.

Q. And can you tell us about that? . . . .

A. So, we had some conversations about that. And he came to me and, you know, we spoke about it. And he said that he might know somebody that will pay his vehicle for him for a fee. If he paid them $20,000, they would pay the vehicle off, which was about a hundred thousand dollars. *So, I, you know, we spoke about it. I told him it didn't sound like, it sounded kind of fishy. He stated the same thing, it sounded kind of fishy, but, that's what they do.*

Testimony of Raphael Oliveri, Transcript, June 4, 2019, at pp. 96-97, Lines 6-9, 23-25, 1-7. Mr. Oliveri further explained the conversation regarding "fishiness" of the proposed deal that he had with the Defendant:

A. I told him it sounds kind of fishy.

Q. What sounds kind of fishy?

A. That someone would payoff his car for a smaller amount, for a fee. For them to pay him a certain amount and they would payoff a larger amount. He would pay them $20,000. They would in turn pay the vehicle off.

Q. What happened next?

A. He said the same thing, it does sound kind of fishy, but, that's what *they* do for a living.

*Id.*, at p. 98, Lines 12-21 (emphasis added). Based on the tenor of the conversation and the information provided by the Defendant, the jury could have reasonably inferred that this conversation occurred before or around the time when the first fraudulent cashier's check was mailed.

In furtherance of their fraud scheme, the following sham cashier's checks were mailed to the victim companies:

| Item | Date | Description |
|---|---|---|
| 1 | February 27, 2017 | A fraudulent cashier's check, in the approximate amount of $51,000, as a payment for Dxrams' Mercedes Benz (MB-1). (Count 6) |
| 2 | February 27, 2017 | A fraudulent cashier's check, in the approximate amount of $101,000, as a payment for Dxrams' Bentley. (Count 7) |
| 3 | February 27, 2017 | A fraudulent cashier's check, in the approximate amount of $300,000, as a payment for Dxrams' Rolls Royce. (Count 8) |

| Item | Date | Description |
|---|---|---|
| 4 | February 27, 2017 | A fraudulent cashier's check, in the approximate amount of $112,000, as a payment for Dxrams' Mercedes Benz (MB-3). (Count 9) |
| 5 | March 9, 2017 | A fraudulent cashier's check, in the approximate amount of $50,000, as payment of the lease for Dxrams' spouse's Mercedes Benz (MB-2). (Count 10) |
| 6 | April 4, 2017 | A fraudulent cashier's check, in the approximate amount of $300,000, as a payment for Dxrams' Rolls Royce. (Count 11) |
| 7 | May 2, 2017 | A fraudulent cashier's check, in the approximate amount of $300,000, as a payment for Dxrams' Rolls Royce. (Count 12) |
| 8 | May 9, 2017 | A fraudulent cashier's check, in the approximate amount of $53,000, as a payment for Dxrams' Mercedes Benz (MB-1). (Count 13) |
| 9 | June 21, 2017 | A fraudulent cashier's check, in the approximate amount of $116,000, as a payment for Dxrams' MB-3. (Count 14) |
| 10 | June 21, 2017 | A fraudulent cashier's check, in the approximate amount of $38,000, as a payment for MB-2, a car leased by Dxrams' spouse's Mercedes Benz (MB-2). (Count 15) |

*Id.*, at ¶ 80, 88; *see also* Dkt. # 83, at pp. 15-16.

As depicted above, the co-conspirators mailed approximately four fraudulent cashier's on or about February 27, 2017 to Bentley, Rolls Royce, and Mercedes-Benz. Thereafter, the Defendant received titles to three cars—his Mercedes-Benz, his spouse's Mercedes-Benz, and the Bentley. PSR, at ¶ 81.

After these fraudulent cashier's checks were mailed, the evidence at trial—including all fair and reasonable inferences drawn in the light most favorable to the Government—established the following:

1. On or about March 3, 2017, the Defendant called Rolls Royce and stated that a pay off check had been mailed on or about February 27, 2017. (GE 15-754.)

2. On or about March 8, 2017, the Defendant called Rolls Royce to check on the status of the pay off, and the Defendant stated he

would check with this bank concerning the payment and call the company back.[3] (GE 15-755.)

3. On or about March 9, 2017, while Reynolds was in Florida, King made, signed, and mailed a fraudulent cashier's check to pay for the Defendant's spouse's Mercedes-Benz (GE 18b-024.)

4. On or about March 10, 2017, after determining that the cashier's check was fraudulent, Mercedes-Benz mailed a letter to the Defendant, stating the following, in substance and in part:

> 03/10/2017
>
> Method of Delivery:
> Federal Express and General Delivery
>
> DANIEL K DXRAMS
> 46 SCHAEFER RD
> MAPLEWOOD NJ 07040-3322
>
> 2015 Mercedes-Benz C300W4 - 55SWF4KB4FU001482 - Account 7004150004001
>
> Dear Mr. DXRAMS,
>
> On 03/03/2017, a payment in the amount of $51,000.00, was received which resulted in the release of the title to you. The payment was returned unpaid by the bank. This is a serious matter.

(GE 18-101).[4]

---

3. The jury was free to infer that the Defendant had made a false statement to Rolls Royce because, at the time of the call, the Defendant knew the $300,000 cashier's check was not issued by any bank.

4. During his own direct examination, the Defendant gave false and conflicting testimony concerning the letter he received from Mercedes Benz. Compare:

Q. Did you ever receive any correspondence or notifications from Mercedes with regards to the payoff -- to the payoff monies that were used in order for you to get that title?

A. No.

Q. Did Mercedes-Benz inform you that there was an issue as far as the payments that were used to obtain that title?

A. No.

5. On or about March 13, 2017, the Defendant called Mercedes-Benz related to the $112,000 payment and was told that the payment had been rejected. (GE 18c-085.)

6. On or about March 13, 2017, the Defendant called Mercedes-Benz a second time related to the $51,000 and asked why the payment had been rejected. (GE 18a-047.)

7. On March 13, 2017, the Defendant deposited at $6,506.54 check into his bank account, which check was issued by Mercedes-Benz as an overage payment related to one of the fraudulent cashier's checks. On the same day, Mercedes-Benz canceled the check and the payment was debited from the Defendant's account. (GE 20-150.)

8. On or about March 15, 2017, after determining that the cashier's check was fraudulent, Mercedes-Benz mailed a letter to the Defendant's wife, demanding the entire payoff balance and noting that previously submitted payment of $50,000 had been returned by the bank. (GE 18-107.)

---

Q. Did Mercedes-Benz inform you that the method of payment was improper?

A. No.

Testimony of Defendant, Transcript, June 14, 2019, at pp. 19-20, Lines 18-25; 1-2.
With:

Q. Did Mercedes-Benz request that you return the title?

A. They did at some point.

Q. Okay. Do you recall around when that was?

A. I don't remember the exact date.

Q. How did you receive the notification?

A. In the mail.

*Id.*, at p. 20, Lines 3-8.

9. On or about March 20, 2017, the Defendant called Rolls Royce, asking why the payoff payment had not been posted (GE 15-758.)

10. On March 21, 2017, the Defendant signed a contract, agreeing to sell the Bentley for $82,000 to a third party-car dealership. On the contract, the Defendant used a Pennsylvania address that did not belong to him.[5] (GE 21-009.)

11. On numerous occasions between March through May 2017, the Defendant accessed his online account with Rolls Royce to check if the $300,000 payoff cashier's check had been accepted. (GE 15-761.)

12. On or about March 28, 2017, the Defendant re-signed a contract, agreeing to sell the Bentley for $82,000 to a third party-car dealership. On the contract, the Defendant again used a Pennsylvania address that did not belong to him. (GE 21-017.)

13. On or about March 28, 2017, the Defendant deposited a $67,000 check into his bank account obtained from the sale of the Bentley, approximately $6,000 in cash, and another $9,000 as an advance to pay for fees and taxes associated with the sale. (GE 20-153, GE 21-002, and GE 21-003.)

14. On or about March 30, 2017, the Defendant withdrew $44,000 from his bank account in two separate withdrawals ($19,000 and $25,000). (GE 20-017 and GE 20-018.)

15. On or about March 30, 2017, the Defendant obtained a genuine cashier's check, in the amount of $25,000, for the benefit of Germaine King. (GE 22L-048.)

---

5. During cross examination, the Defendant admitted that he lied to the Commonwealth of Pennsylvania on two occasions to obtain driver's licenses. For example:

> Q. And you claim[ed] [on the driver's license application] that you lived at [a residence in] Stroudsburg, Pennsylvania.
>
> A. Correct.
>
> Q. That was a blatant lie . . . . Was it a lie?
>
> A. Yes, it was a lie.

Testimony of Defendant, Transcript, June 14, 2019, at p. 135, Lines 1-8.

After these transactions, the Defendant continued to work with King and Reynolds in his efforts to discharge his debts.

In mid-2017, Bentley filed a lawsuit against the Defendant related to his fraudulent acquisition of title and then sale of the car. In July 2017, the Defendant, with the assistance of Reynolds, removed the case into federal court. During the pendency of both matters, the Defendant made materially false statements to the courts. For example, in federal court, the Defendant made the following statement under penalty of perjury:

Case 2:17-cv-05060-CCC-JBC Document 6 Filed 07/24/17 Page 1 of 5 PageID: 112

> 12. Defendant denies failing to make payments. Defendant paid car off in full with certified funds. Bentley never sent Defendant a copy of the certified check indicating that the funds were rejected. The Bill of Exchange Act and New Jersey Code Title 2A states what notification should be sent out to a Payee for a bad check. Bentley did not send a letter indicating the check was dishonored.

While under oath in state court and while being questioned by a state judge, the Defendant stated the following:

```
MR. DXRAMS: -- is in, copy of, copy of the
evidence, evidence record by Your Honor. I have no way
of showing if the car was paid off or not; because,
that's not my account. It didn't come from my account.
I didn't send a check to Bentley. I have no way of
showing that was payoff.
```

GOVERNMENT EXHIBIT 10c-1.11

After he was unable to discharge many of his lawful debts through the cashier's check scheme, the Defendant then turned to the bankruptcy code. In an effort to obtain the protections of the bankruptcy code and obtain a fresh start, the Defendant filed the bankruptcy petition (the "Petition"). On his Petition (and corresponding schedules), he lied about and concealed facts about his income (including significant amounts of cash from his car rental business, his assets and certain property, and his marital status, among other things.

## The Applicable Legal Standards

### A. The Rule 29 Standard

"After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Lore*, 430 F.3d 190, 203-04 (3d Cir. 2005) (quotation omitted); *see also United States v. Fernandes*, 272 F.3d 938, 943 (7th Cir. 2001) ("a challenge to the sufficiency of the evidence is an uphill battle").

"A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). Furthermore, Federal Rule of Criminal Procedure 29(c)(2) states the following, in pertinent part: "If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. Fed. R. Crim. P. 29(c)(2)." A judgment of acquittal is appropriate under Rule 29 for insufficiency of the evidence if the Court determines that no jury could rationally find proof of guilt beyond a reasonable doubt given the evidence presented in the case. *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006).

In determining whether to grant a Rule 29 motion, the Court views the available evidence in the light most favorable to the Government. *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (citing *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)); *see also United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003) (noting the Court views the evidence "in the light most favorable to the government . . . [and] credit[ing] all available inferences in favor of the government"). An insufficiency of the evidence finding, and consequent acquittal, should be "'confined to cases where the prosecution's failure is clear'"— a heavy burden. *Smith*, 294 F.3d at 477 (*quoting United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)). "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Lore*, 430 F.3d 190, 203 (3d Cir. 2005) (quoting *United States v. Serafini*, 233 F.3d 758, 770 (3d Cir. 2000)).

"Courts must be ever vigilant in the context of [Rule] 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)(citations omitted). "Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt," may the Court overturn the jury's verdict. *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1990) (citation omitted). "To sustain the jury's verdict, the evidence does not need to be

inconsistent with every conclusion save that of guilty." *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990) (citation omitted). "There is no requirement . . . that the inference drawn by the jury be the only inference possible or that the government's evidence foreclose every possible innocent explanation." *United States v. Iafelice*, 978 F.2d 92, 97 (3d Cir. 1992). Therefore, a defendant must show that no evidence could support the jury rationally finding him guilty in this case. *See McNeill*, 887 F.2d at 450.

Accordingly, a reversal is appropriate only where "the jury's conclusion is irrational," *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 432 (3d Cir. 2013) (en banc), *i.e.*, where there is " 'no evidence, regardless of how it is weighted, from which the jury could find guilt,'" *United States v. Mussare*, 405 F.3d 161, 166 (3d Cir. 2005) (quoting *United States v. Anderson*, 108 F.3d 478, 481 (3d Cir. 1997)). The essential question is thus not whether the Court believes "that the evidence at the trial established guilt beyond a reasonable doubt," but rather whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

### B. The Rule 33 Standard

Federal Rule of Criminal Procedure 33(a) provides that the district court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2).

When evaluating a Rule 33 motion, the district court "does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). However, the authority to grant a new trial pursuant to Rule 33 is limited to those instances where the Court "believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* (quotation omitted). "Thus, <u>motions for a new trial based on the weight of the evidence are not favored</u>. <u>Such motions are to be granted sparingly and only in exceptional cases</u>." *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014) (quotation omitted) (emphasis added); *United States v. Silveus*, 542 F.3d 993, 1004-05 (3d Cir. 2008); *Gov't of the V.I. v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987).

> Manifest injustice cannot be found simply on the basis of the trial judge's determination that certain testimony is untruthful, unless the judge is prepared to answer 'no' to the following question: 'Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a

> reasonable doubt?' In making this assessment, the judge must examine the totality of the case.

*United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009) (per curiam) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).

A district court also has authority under Rule 33 to grant a new trial for errors occurring during trial that affected its outcome. A court may grant a motion for new trial if it finds errors occurred during the trial and these errors "when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir.1993)(quotation omitted). Harmless errors that do not deprive a defendant of a fair trial provide no basis for granting a defendant's Rule 33 motion. *Id*. The defendant bears the burden of proving a new trial should be granted, and must therefore show "(1) that error occurred at trial, and (2) that error had a substantial influence on the verdict." *United States v. Amirnazmi*, 648 F.Supp. 2d 718, 720 (E.D. Pa. 2009), *aff'd*, 645 F.3d 564 (3d Cir. 2011). Motions for a new trial are disfavored and "only granted with great caution and at the discretion of the trial court." *United States v. Martinez*, 69 Fed. App'x. 513, 516 (3d Cir.2003) (unpublished).

## Argument

1. The Defendant Is Not Entitled To a Judgment Of Acquittal Or A New Trial On Counts 5-15 (Mail Fraud Conspiracy and Substantive Mail Fraud)[6]

The Defendant's Rule 29 and 33 motions should be denied because the evidence established proof of the Defendant's guilt beyond a reasonable doubt as to each count, and sufficient evidence was presented at trial to permit a rational jury to reach such a conclusion.

Count 5: Count 5 charged the Defendant and King with conspiring to commit mail fraud by mailing and causing to be mailed fraudulent cashier's checks to three car leasing companies in an effort to fraudulently obtain titles to a Bentley, Rolls-Royce, and Mercedes-Benz cars.

To prove this count, the Government had to adduce sufficient proof of the following: (1) That two or more persons agreed to commit an offense against the United States, as charged in the Second Superseding Indictment (the "Indictment"); (2) That the Defendant and King were each a party to or member of that agreement; (3) that the Defendant and King each joined the agreement

---

6. The Government notes that the Defendant's Rule 29 and 33 motions were filed well past 14 days provided in the Rule; nonetheless, the Government will address the merits of the Defendant's arguments.

or conspiracy knowing of its objective to commit an offense against the United States and intending to join together with at least one other alleged conspirator to achieve that objective.

To establish a conspiracy, the Government must prove "that the alleged conspirators shared a unity of purpose, the intent to achieve a common goal, and an agreement to work together toward the goal." *United States v. Holmes*, 387 Fed.Appx. 242, 245 (3d Cir. 2010) (quoting *United States v. Reyeros*, 537 F.3d 270, 277 (3d Cir. 2008)). Since conspiratorial agreements are rarely obvious, the Court has stated that:

> The existence of a conspiracy can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference [ ] that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding.

*Holmes*, 387 Fed.Appx. at 242 (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).

In *United States v. Antar*, 53 F.3d 568 (3d Cir. 1995), the Third Circuit held that the trial judge properly refused to dismiss charges of conspiracy and substantive offenses committed by co-conspirators because of the statutes of limitations, finding that the defendant failed to make out a prima facie case of withdrawal. Although *Antar* involved an 18 U.S.C. § 1962(d) RICO conspiracy, not a section 371 conspiracy, the Third Circuit noted that, "[i]n this regard, section 1962(d) long has been interpreted against the backdrop of traditional conspiracy law and thus the same analysis applies both to the RICO and section 371 conspiracies." *Id.* at 582. With respect to the standard for withdrawal, the court stated (*id.*):

> The Supreme Court long ago set forth a rigorous standard for demonstrating withdrawal. In 1912, in *Hyde v. United States,* 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912), the Court explained:
>
> Having joined in an unlawful scheme, having constituted agents for its performance, scheme and agency to be continuous until full fruition be secured, until he does some act *to disavow or defeat the purpose* he is in no situation to claim the delay of the law. As the offense has not been terminated or accomplished, he is still offending. And, we think, consciously offending, offending as certainly … as at the first moment of his confederation, and continuously

> through every moment of its existence.... Until he does withdraw there is conscious offending.... *Id.* at 369-70, 32 S.Ct. at 803 (emphasis added).
>
> Thus, we have held that "[m]ere cessation of activity in furtherance of an illegal conspiracy does not necessarily constitute withdrawal." *United States v. Steele,* 685 F.2d 793, 803 (3d Cir. 1982), *cert. denied,* 459 U.S. 908, 103 S. Ct. 213, 74 L. Ed.2d 170 (1982). Rather, "[t]he defendant must present evidence of some affirmative act of withdrawal on his part, *typically either a full confession to the authorities or communication to his co-conspirators that he has abandoned the enterprise and its goals.*" *Id.* at 803-04 (emphasis added); *see also United States v. Heckman,* 479 F.2d 726, 729 (3d Cir.1973). Of course, there is no single way withdrawal can be established; in large part whether a particular action constitutes withdrawal depends on context. Thus, the Supreme Court has cautioned against placing "confining blinders" on the jury's consideration of evidence of withdrawal and has held that "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." *United States v. United States Gypsum Co.,* 438 U.S. 422, 464-65, 98 S. Ct. 2864, 2887, 57 L. Ed.2d 854 (1978).

In *United States v. United States Gypsum Co.,* 438 U.S. 422, 463-64 (1978), the Supreme Court held it was error to instruct the jury that, "[i]n order to find that a defendant abandoned or withdrew from a conspiracy ... you must find, from the evidence, that he or it took some affirmative action to disavow or defeat its purpose. Mere inaction would not be enough to demonstrate abandonment. To withdraw, a defendant *either must have affirmatively notified each other member of the conspiracy he will no longer participate in the undertaking so they understand they can no longer expect his participation or acquiescence, or he must make disclosures of the illegal scheme to law enforcement officials.*" The Court reasoned that, "[t]he charge, fairly read, limited the jury's consideration to only two circumscribed and arguably impractical methods of demonstrating withdrawal from the conspiracy." *Id.*

Here, the evidence adduced at trial clearly established that the Defendant, King, and Reynolds plotted together to use fraudulent cashier's checks to obtain outright ownership of the Defendant's luxury cars. As the trial record demonstrates, the Defendant (a) met and spoke with King and

Reynolds about the cashier's checks; (b) knew that they would use a computer to create the homemade checks; and (c) provided them with payoff information related to certain of his luxury cars.

Furthermore, based on all the direct and circumstantial evidence (*e.g.*, the Defendant's acknowledgment that the scheme appeared "fishy," that Reynolds had a her own "private estate," and the checks were required to go to the Puerto Rico IRS office, a bank, and the U.S. Treasury office), the jury was permitted to conclude that the Defendant had the specific intent to defraud at the time he commenced his participation in the scheme.

In addition, the Government presented overwhelming evidence that the Defendant was placed on notice numerous times that the cashier's checks were fraudulent (*i.e.*, the March 10, 2017 letter from Mercedes-Benz that prompted him to return title); nonetheless, the Defendant continued to participate in the scheme, including selling the Bentley and then kicking back $25,000 to King.

Finally, the evidence clearly negated any lack of intent defense proffered by the defense. The evidence established that the Defendant was a smart and savvy individual. He was employed by New Jersey as an investigator/social worker. In addition, he was also self-employed and engaged in a car rental business, where his bank records show thousands of dollars in cash deposits into a myriad of accounts controlled solely by the Defendant. Taking into account his experience and ability to perceive (like all witnesses), the jury was free to conclude that the Defendant's explanations concerning his understanding of the scheme made no sense and were ridiculous.
Based on the incredulous nature of the Defendant's testimony, the jury rejected his lack of intent claims and found that he knowingly and intentionally joined the scheme.

In sum, this case involved two competing theories: the Government posited that the Defendant knowingly and intentionally entered into this fraud scheme for his own financial benefits, namely, obtaining multiple luxury cars without paying for them. The Defendant claimed he was unwitting duped and was tricked by two schemers. The jury weighed credibility of all witnesses and assigned weight to the evidence and found the Defendant guilty.

Because the jury's conclusion was not irrational and a reasonable jury could have reached this conclusion, neither a judgment of acquittal or a new trial is warranted.

<u>Counts 6-15</u>: Counts Six through Fifteen charged King and the Defendant with substantive Mail Fraud for mailing fraudulent cashier's checks to certain auto leasing companies. To prove these counts, the Government had to adduce sufficient proof of the following: (1) the Defendant or a co-schemer knowingly devised or willfully participated in a scheme to defraud the victim companies of money or property by materially false or fraudulent pretenses,

representations or promises; (2) the Defendant acted with the specific intent to defraud; (3) in advancing, furthering, or carrying out the scheme, the Defendant or a co-schemer used the mails, a private or commercial interstate carrier, or caused the mails or a private or commercial interstate carrier to be used; and (4) the violation affected a financial institution.

For the same reasons set forth above, the substantive mail fraud counts against the Defendant must stand.

2. The Defendant Is Not Entitled To A Judgment Of Acquittal Or New Trial On Counts 16-17 (Bankruptcy Fraud and Making a False Oath)

Counts 16 and 17 charge the Defendant with bankruptcy fraud related to his concealment of business income and other income.[7] Count 16 charges the Defendant with "knowingly conceal[ing], . . . falsif[ying], and [making] false entries in [his bankruptcy petition] . . . with the intent to impede . . . [a bankruptcy proceeding] . . . .[i]n violation of Title 18, United States Code, Section 1519 and 2. (Indictment, Dkt# 83, at p. 22.) The Government must prove that the Defendant knowingly acted. *See United States v. McQueen*, 727 F.3d 1144, 1151-52 (11th Cir. 2013) (requiring the prosecution to prove "knowingly" alter, destroy, mutilate, conceal, cover up, falsify, or make a false entry).

Introduction of Government's Exhibit 6-2: The Defendant erroneously claims that GE 6-2 was improperly admitted into evidence. This exhibits focused on cash deposits into the Defendant's bank accounts during the periods relevant to his Petition.

7. Count 16 alleges that defendant Dxrams made false statements and concealed facts related to the following questions on his bankruptcy petition: "Did you have any income from employment or from operating a business during this year (2017) or the two previous calendar years (2016 and 2015)?" and "Did you receive any other income during this year (2017) or the two previous calendar years (2016 and 2015), including money collected from lawsuits?"

GE 6-2 is set forth below:

**Summary of Deposits**
**Dxrams/Kusi Accounts**

| Item | Year | Total Deposits* | Total Cash Deposits | Total Paypal |
|---|---|---|---|---|
| 1 | 2015 | $25,957.11 | $8,547.12 | $6,910.00 |
| 2 | 2016 | $138,267.26 | $88,742.80 | $8,697.03 |
| 3 | 2017 | $200,736.38 | $78,958.17 | $16,773.29 |
| 4 | **Totals** | $364,960.75 | $176,248.09 | $32,380.32 |

* ***Excluding Salary & Tax Refunds***

GOVERNMENT EXHIBIT 6-2

Count 16 (bankruptcy fraud) more specifically alleged that the Defendant had income from operating a business during 2017, 2016, and 2015, which income he concealed during his bankruptcy proceeding. After laying the appropriate foundation with the relevant witness, the Government introduced evidence from the Defendant's bank accounts, along with a summary chart of the total cash and other deposits to show that he operated a business between 2015 and 2017, and that he derived income from the operation of the business, contrary to the representations he made on his Petition and during his bankruptcy proceeding. In addition, the Government made efforts to ensure that the jury knew that the analysis excluded money he made from his state employment and from tax refunds. Accordingly, GE 6-2 was highly relevant in proving the charge set forth in the Indictment and was not prejudicial.

Communication With Bankruptcy Lawyer: The Defendant claims that he had "trouble communicating with his bankruptcy lawyer" and as such its "unclear whether the jury convicted [the Defendant] based upon the numerous alleged omission or misrepresentations contained on his bankruptcy filing." Dkt. # 154 at 19.

The jury did not believe the Defendant's claim as it relates to this issue. The Defendant provided detailed information to the bankruptcy staff and/or lawyer when it was favorable to him. For example, the Defendant provided information for sixteen creditors when he had debt, and he did so with great specificity because he wanted these debts to be discharged. June 19, 2019 Tr. at 127:17-21 to 128:1-5. It is reasonable to infer that the jury chose not to believe the Defendant when he testified regarding this issue – they reasonably

concluded that he provided detailed information to the bankruptcy staff about things that were financially beneficial to him but he was untruthful about assets that he may lose. *Id.*, at 128:20-25; 129:1-13. The jury reasonably concluded that when the Defendant showed up to sign the Petition he knew exactly what information it contained and what information it did not contain.

<u>The Defendant Had a Fair Trial Despite his Failed Trial Strategy</u>

The Defendant argues that he had did not file for a motion to sever for the following reasons: (1) that he had "no indication whatsoever that [King] would testify in such an incredibly prejudicial manner," Dkt. 154 at 19; (2) that he had "no indication whatsoever that [King] would testify on his own behalf," *id.* at 19-20; and (3) that the Defendant "would have never been able to call [King] to testify on his behalf if the trial had been severed, *id.* at 20.

All of these arguments have been (1) waived and (2) are meritless. A Rule 14 motion to sever defendants "must" be raised before trial. Fed. R. Crim. P. 12(b)(3)(D); *United States v. Williams,* 711 F.2d 748, 750 (6th Cir.1983) (asserting claim of improper joinder asserts error in indictment). Failure to do so may constitute waiver of the severance argument. Fed. R. Crim. P. 12(b)(3)(D); *see also United States v. Mann,* 161 F.3d 840, 861–62 (5th Cir.1998) (failure to object to joinder waives issue on appeal); *Williams,* 711 F.2d at 750–51 (acknowledging agreement among courts and commentators that failure to raise misjoinder argument before trial waives issue on appeal); *United States v. Greenleaf,* 692 F.2d 182, 187 n. 4 (1st Cir.1982) (failure to raise misjoinder or severance arguments before trial constitutes waiver); *United States v. Ochs,* 595 F.2d 1247, 1260 n. 11 (2d Cir.1979) (defendant waived improper joinder argument by failing to challenge indictment under Rule 8(a)); *United States v. Green,* 561 F.2d 423, 426 (2d Cir.1977) (failure to claim improper joinder of offenses or defendants before trial constitutes waiver). If the severance argument is not raised pretrial, the Defendant must show "good cause" for failing to raise these claims. Fed. R. Crim. P. 12(b)(4)(c)(3). "[W]here an appellant failed to move to sever before trial as Federal Rule of Criminal Procedure 12(b) requires, he waive[s] his severance argument on appeal" *see United States v. Akins*, 746 F.3d 590, 607-08 (5th Cir. 2014) (footnotes omitted), and it would only be reviewed for plain error, *see United States v. Heilman*, 377 F. App'x 157, 201 (3d Cir. 2010) (not precedential).

Here, the Defendant <u>strategically</u> chose not to move to sever the trial before the trial. Part of the Defendant's strategy was to show the jury that King was "cool, calm, collected," and "knowledgeable, intelligent" about the schemes that he participated in with Dxrams, Reynolds, and/or others. June 19, 2019 Tr. 97: 22-25. The other part of the Defendant's strategy was to portray himself as a "simple man," *id.*, at 95:2, not the "calculated man" who went through various machinations to get cheaper insurance in Pennsylvania when in fact he was living in New Jersey or to change his DMV license from New Jersey to Pennsylvania, *id.*, at 134: 12-25, Tr. 135-1:12. If the Defendant had

not been convicted he would have considered this a great strategy. He cannot now be heard to complain because his strategy failed. He cannot have it both ways. Beyond this calculated, unsuccessful strategy, the Defendant makes no effort to show good cause for his failure to raise these facial attacks prior to trial. Having failed to show good cause, this Court should deem the Defendant's claim waived outright. *See United States v. Ferriero*, 866 F.3d 107, 122 n.17 (3d Cir. 2017) (acknowledging, but declining to reach, question whether lack of good cause under amended version of Rule 12(c)(3) means waiver or forfeiture).

Conclusion

For the reasons set forth above, the United States respectfully requests that the Court deny the Defendant's motion to set aside the jury's verdict. Finally, the United States respectfully requests that the Court sentence the Defendant on January 7, 2020, as previously scheduled.

Respectfully submitted,

Craig Carpenito
United States Attorney

/s/ Lakshmi Srinivasan Herman
By: Lakshmi Srinivasan Herman
Anthony Moscato
Assistant U.S. Attorneys

cc: Michael Orozco, Esq.