Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

   *Plaintiff*,

 v.

DANIEL KUSI, FORMERLY KNOWN AS "DANIEL K. DXRAMS",

   *Defendant*.

Crim. No. 18-379

**OPINION**

**John Michael Vazquez, U.S.D.J.**

   This matter comes before the Court by way of Defendant Daniel Kusi's motion for compassionate release. D.E. 190. The Government filed opposition, D.E. 191, to which Kusi replied, D.E. 192. Defendant then filed an addendum, D.E. 212, to which the Government filed opposition, D.E. 218. Defendant's primary argument is that he should be released because of COVID-19 and his hypertension. The Court reviewed the parties' submissions[1] and considered the motion without oral argument pursuant to Local Criminal Rule 1.1 and Local Civil Rule 78.1(b). Defendant seeks immediate release due to the ongoing COVID-19 pandemic. For the following reasons, Defendant's motion is denied.

---

[1] Defendant's brief in support of his motion is referred to as "Br." (D.E. 190); the Government's opposition brief is referred to as "Opp." (D.E. 191); Defendant's reply letter brief is referred to as "Reply." (D.E. 192); Defendant's addendum is referred to as "Add." (D.E. 212); and the Government's opposition to the addendum is referred to "Add. Opp." (D.E. 218). The Court also received and reviewed letters of support from Defendant's brother and a person who has known Defendant for fifteen years.

## I.      BACKGROUND

### A. Underlying Criminal Proceeding

On November 9, 2018, a 17-count Second Superseding Indictment was returned against Defendant and Germaine King. Defendant was charged in the following counts: Count 5 – conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349; Counts 6-15 – mail fraud in violation of 18 U.S.C. § 1341; Count 16 – falsification in bankruptcy proceedings in violation of 18 U.S.C. § 1519; and Count 17 – bankruptcy fraud (false oath) in violation of 18 U.S.C. § 152(2). Defendant and King then went to trial, before Judge Walls, from May 21, 2019 to June 20, 2019. D.E. 111-17, 120-31. On June 20, the jury found Defendant guilty of all counts for which he was indicted. D.E. 133.

Defendant's fraud convictions stemmed from his car rental business in which he leased high-end vehicles, such as a Mercedes-Benz, Bentley and Rolls Royce. PSR ¶ 75. Defendant leased the vehicles, and his monthly rental payments were as high as $1,965 and $4,046 per vehicle. *Id.* In late 2016, Defendant had difficulty making the large monthly rental payments. *Id.* ¶ 78. King approached Defendant with a scheme to pay off the vehicles and obtain title. *Id.* King and his cohort, Melissa Reynolds, were making fraudulent cashier's checks on their home computer. *Id.* ¶ 79. Between February 27, 2017 and March 9, 2017, five fraudulent cashier's checks, totaling approximately $614,000, were mailed to the various leasing companies. *Id.* ¶ 80. Mercedes Benz then sent Defendant title for three vehicles, but soon realized that the cashier's checks were fraudulent. *Id.* ¶ 81. Bentley also sent a vehicle title to Defendant after receiving a fraudulent $101,000 cashier's check. *Id.* ¶ 85. Before Bentley caught on, Defendant sold the Bentley for $82,000, giving King $25,000 from the proceeds. *Id.* Between May 2, 2017 and June

21, 2017, Defendant (along with King and Reynolds) caused three additional fraudulent cashier's checks, totaling $507,000, to be sent to leasing companies. *Id.* ¶ 88.

The bankruptcy crimes stemmed from the fraud scheme. Defendant was subsequently sued by Bentley, and Defendant filed for bankruptcy. However, he could not discharge debts that were incurred through fraud. *Id.* ¶ 91. In his bankruptcy petition, Defendant falsified and/or concealed numerous material facts, including the following: concealing his ownership of firearms, concealing pending lawsuits in which he was the plaintiff, concealing his self-employment (along with his related income) and his wife's employment, falsely claiming that he was not married, concealing other income, and concealing his transfer of the Bentley. *Id.* ¶ 92. Defendant likewise concealed $364,960.75 in deposits during the relevant timeframe. *Id.* ¶ 93. When Defendant appeared before the Bankruptcy Trustee, he lied under oath about the accuracy of his petition. *Id.* ¶ 95.

During his criminal trial, Defendant claimed that he did not know that he had to report the sale of his Bentley in the bankruptcy proceedings. *Id.* ¶ 96. Defendant further testified that he did not recall transferring anything of value during the two or three years prior to the filing of his bankruptcy petition. *Id.*

The matter was transferred to the undersigned for sentencing. D.E. 149. On January 7, 2020, the Court sentenced Defendant to fifty-eight months on each count, all terms to run concurrently. D.E. 161, 165, 169. The Court also permitted Defendant to report for the service of his sentence, rather than remand him.

Kusi is housed at FCI Loretto in Pennsylvania. Kusi is currently scheduled to be released on August 21, 2024.

### B. COVID-19 Pandemic

COVID-19 "is caused by the virus severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), a new virus in humans causing respiratory illness which can be spread from person-to-person." *Coronavirus Disease 2019 (COVID-19)*, "COVID-19 Overview and Infection Prevention and Control Priorities in non-US Healthcare Settings," Centers for Disease Control and Prevention (Aug. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/non-us-settings/overview/index.html#background. "COVID-19 is primarily transmitted from person-to-person through respiratory droplets. These droplets are released when someone with COVID-19 sneezes, coughs, or talks." *Id.* Persons who contract the virus reflect a wide range of symptoms from asymptomatic to mild (including fever, cough, nausea, chest pain, and body pain) to severe to critical (including respiratory failure and death). *Id.* Currently, there is no known cure for COVID-19. As a result, standard precautions to prevent the spread of the virus include social distancing, proper hygiene, personal protective equipment (including use of a face mask), and maintenance of clean surfaces and devices. *Id.*

Numerous factors can increase a person's risk of severe illness if he/she contracts the virus. As a person get older, his/her risk for severe illness from COVID-19 increases. *COVID-19*, "Older Adults," Centers for Disease Control and Prevention (May 14, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html. For example, persons in their sixties and seventies are at a higher risk than people in their fifties. *Id*. Those 85 or older are at greatest risk. *Id.* Adults 65 or older comprise 8 out of 10 COVID-19 deaths in the United States. *Id.* The following medical conditions put a person at increased risk of severe illness from COVID-19: cancer, chronic kidney diseases, chronic lung diseases (including asthma if it is moderate to severe), dementia or other neurological conditions, heart

conditions such as coronary artery disease, weakened immune system from organ transplant, obesity, pregnancy, sickle cell disease, smoking, stroke or cerebrovascular disease, and type 2 diabetes mellitus. *COVID-19*, "People with Certain Medical Conditions," Centers for Disease Control and Prevention (May 13, 2021),[2] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

As of January 11, 2022, the United States had 61,732,283 COVID-19 cases, resulting in 837,274 deaths. *CDC COVID Data Tracker*, "United States COVID-19 Cases and Deaths by State," https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited Jan. 11, 2022).

## C. Federal Bureau of Prisons

The Federal Bureau of Prisons ("BOP") has taken the following steps to combat the virus. On March 13, 2020, the BOP modified its operations in accordance with its "COVID-19 Action Plan." *Federal Bureau of Prisons COVID-19 Action Plan*, Federal Bureau of Prisons (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp. Initially, all social visits, inmate movement, and official staff travel were suspended for thirty days. *Id.* Contractors who enter any BOP facility are screened for the virus, and initially admission was limited to contractors who performed essential services. *Id.* The BOP also conducts enhanced health screenings for staff in areas of "sustained community transmission." *Id.* The BOP screens all new inmates for virus "exposure risk factors and symptoms." *Id.* Any new inmate who is asymptomatic but has had a risk of exposure is quarantined. *Id.* According to the Government, the quarantine period is for a minimum of fourteen days or until cleared by medical staff. Opp. at 5. The Government indicates

---

[2] The CDC previously provided two separate lists, one listing conditions that entailed a greater risk of severe illness and one setting forth conditions that might involve a greater risk.

that new inmates who are symptomatic are placed in isolation until they test negative for the virus or are cleared by medical staff.  *Id.*  The Government also states that the BOP has taken the following steps to prevent the spread of the virus:  group gatherings are limited to permit social distancing as much as possible, all staff and inmates have been issued face masks, and all staff and inmates are strongly encouraged to wear face masks when social distancing cannot be achieved.  *Id.*

The BOP also has a COVID-19 vaccination plan.  *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Mar. 11, 2021), https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf.  Inmates fall into different priority levels for vaccination:  Priority Level 1 (for inmates in certain high priority jobs, including health service unit assignments); Priority Level 2 (inmates who are 65 or older, or who are, according to CDC criteria, at an increased risk for severe illness from the virus); Priority Level 3 (inmates who are aged 50 through 64 or who might be, according to CDC criteria, at an increased risk for severe illness from the virus); and Priority Level 4 (all other inmates).  *Id.*  As of January 11, 2022, the BOP had administered 282,378 doses of vaccine.  *COVID-19*, "Vaccine Implementation," Federal Bureau of Prisons, https://www.bop.gov/coronavirus/index.jsp (last visited Jan. 11, 2022).

As of January 11, 2022, the BOP COVID-19 statistics are as follows:  (1) currently, 4,377 inmates and 928 staff have confirmed positive tests; (2) 42,491 inmates and 8,944 staff have recovered; and (3) 275 inmates (11 while on home confinement) and 7 staff have died.  *COVID-19 Cases*, Bureau of Prisons (last visited Jan. 11, 2022), https://www.bop.gov/coronavirus/index.jsp.  FCI Loretto – where Defendant is housed – currently

has 101 positive inmates and 4 positive staff members. *Id.* In addition, 603 inmates and 69 staff have recovered. *Id.* The facility has not reported any deaths due to COVID-19. *Id.*

### D. Kusi's Other Relevant Background, Activities, and Conditions

Defendant is 43 years old and suffers from hypertension for which he takes medication. He asks to be released due to his hypertension and the impact that COVID-19 has had at FCI Schuylkill, where he was housed when he first filed his motion. Br. at 1-4. Defendant also asserts that he is more vulnerable because he is in an ethnic minority group. *Id.* at 3. Defendant appears to indicate that he has already tested positive for COVID-19 and acknowledges that his medical records reflect that he is fully recovered. *Id.* at 2. However, Defendant contends that it is "impossible" to know whether he has recovered because he could be reinfected. *Id.* Defendant concludes that the factors under 18 U.S.C. § 3553 support his release, although he largely reiterates his hypertension in support. *Id.* at 4, 7. Defendant adds that he has been a model prisoner, completing several courses while incarcerated. *Id.* at 8; D.E. 192 at 2 (listing educational courses that Defendant has completed).

The Government opposes Defendant's motion, arguing that Defendant has not shown extraordinary and compelling reasons to justify his release. Opp. at 9. As to Defendant's hypertension, the Government argues that Defendant has not shown that the BOP is incapable of providing him adequate care. Opp. at 10. The Government also notes that Defendant is relatively young and that he has not shown that his race will increase his susceptibility to COVID-19. *Id.* at 10-11. The Government continues that the Section 3553(a) factors do not support his release as he engaged in serious criminal activity. *Id.* at 13. The Government further asserts that the amount of time remaining on Defendant's sentence weighs against his release. *Id.* at 14.

In his addendum, Defendant asserts that his current facility, FCI Loretto went to a condition red (the most critical) for COVID operations in August 2021.[3] Add. at 2. Defendant adds that he is now 43 and that he "is an accomplished, well-rounded and successful professional with substantial education history." *Id.* Kusi further points to his family and community ties. *Id.* at 3-4.

In response to the addendum, the Government notes that Kusi has been vaccinated against COVID-19.; the Government notes that Defendant previously tested positive for the virus and fully recovered. Add. Op. at 1, 2. The Government continues that Defendant has served less than 30% of his sentence. *Id.* at 2. The Government also notes that Defendant has had two incident reports, one of which was deemed "serious." *Id.* The Government reports that Kusi's hypertension is being treated with a minimal dosage of prescription medication. *Id.* At the time of the Government's submission, approximately 98% of the inmates at FCI Loretto had been fully vaccinated. *Id.* at 4-5.

Defendant wrote to the Warden of FCI Schuylkill, seeking his release for the same reasons he raises now. The Warden denied Defendant's request. Br., Ex. A. The Warden noted that Defendant had not provided all required information, including his proposed release plan, and had not yet completed 50% of his sentence. *Id.*

## II.     LEGAL STANDARD

Following the passage of the First Step Act, Section 3582(c)(1)(A) now reads as follows:

> (c) Modification of an imposed term of imprisonment. The court may not modify a term of imprisonment once it has been imposed except that—

---

[3] Defendant included the warden's August 27, 2021 memorandum as an exhibit. Add., Ex. 2. Among other things, the warden required masks to be worn in all areas outside of assigned rooms, visitors to be screened for temperature and COVID questions before entry, requiring visitors to maintain social distancing along with wearing a mask, random testing in addition to regular testing, and increased disinfecting in numerous areas. *Id.*

>(1) in any case—
>
>>(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), *after considering the factors set forth in section 3553(a)* to the extent that they are applicable, if it finds that—
>>
>>>(i) *extraordinary and compelling reasons warrant such a reduction*; or
>>>
>>>(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and *a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g)*;
>>>
>>>*and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission*; and
>>
>>(B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure; and
>
>(2) in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A) (emphases added).  The Government is not contesting that Defendant has satisfied the statutory exhaustion requirement.  Opp. at 4 n.2.

The applicable policy statement of the United States Sentencing Commission is found in Section 1B1.13.  U.S. Sentencing Guidelines Manual § 1B1.13 (U.S. Sentencing Comm'n 2018).

9

The application notes to the section provides four circumstances that can be considered extraordinary and compelling: (1) the medical condition of the defendant, (2) the age of the defendant, (3) family circumstances, and (4) other circumstances constituting an extraordinary or compelling reason, either considered alone or in combination with any of the other three stated reasons. *Id.* cmt. n. 1(A)-(D). In *United States v. Andrews*, 12 F.4th 255, 259-60 (3d Cir. 2021), the Third Circuit found that the policy statement was not binding on courts but nevertheless found that the statement could provide useful guidance.

Pursuant to Section 3582(c)(1)(A), the Court must also consider the factors listed in 18 U.S.C. § 3553(a). They include the nature and circumstances of Defendant's offense, the history and characteristics of Defendant, the need for the sentence to provide just punishment, and the need to protect the public from future offenses of Defendant. *Id.*

### III.    ANALYSIS

The Court finds that Kusi has not met his burden of demonstrating extraordinary and compelling reasons to justify his release. The Court also finds that Kusi has failed to show that the Section 3553(a) factors support his release.

Turning first to Defendant's arguments concerning the pandemic, his hypertension is well-controlled with prescription medication. As to Defendant's argument concerning his race, the CDC information does not indicate that race itself is a factor (unless a person has a medical issue that is race specific, such as sickle cell anemia). Instead, race is a factor due to related societal inequities that have a greater impact on minority groups, such as lack of access to adequate medical care. Here, Kusi has not shown that FCI Loretto is providing him lesser medical care due to his race. In addition, Kusi already had COVID-19 and recovered. The CDC reports that "[c]ases of reinfection with COVID-19 have been reported, but remain rare." *COVID-19*, "Reinfection with

COVID-19," Centers for Disease Control and Prevention, (last update Aug. 6, 2021), https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html.  Importantly, Kusi has since been vaccinated, which not only increases his chances against reinfection but also helps protect against severe illness should he be reinfected.  *COVID-19*, "Omicron Variant:  What You Need to Know," Centers for Disease Control and Prevention, (last visited January 12, 2022), https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html.  Finally, while there are a number of positive cases currently at FCI Loretto, the institution has avoided any deaths (of either inmates or staff).  And, unfortunately, the increased infection rate reflects a surge of positive cases in American society as a whole due to the Omicron variant; such surges are not limited to BOP facilities.  *See, e.g.*, "Omicron is spreading at lightning speed.  Scientists are trying to figure out why," npr (Dec. 31, 2021), https://www.npr.org/sections/goatsandsoda/2021/12/31/1067702355/omicron-is-spreading-like-wildfire-scientists-are-trying-to-figure-out-why.html.

However, even if Kusi had demonstrated extraordinary and compelling circumstances, the Court would nevertheless deny his motion under Section 3553(a).  Kusi committed several offenses and also perjured himself at trial.  Given that his sentencing was in 2020, the Court's Section 3553(a) analysis at that time is still relevant.  While Kusi has completed several educational courses while in prison, his education was never an issue at sentencing; he has a college degree.  PSR § 151.  As to Kusi's arguments concerning his education, his past work, his family, and his community ties, the Court was well aware of each at the time of his sentencing.

Moreover, Kusi still has over 50% of his sentence remaining, which weighs against granting his motion.  *See United States v. Pawlowski*, 967 F.3d 327, 330-31 (3d Cir. 2020) (ruling that in deciding a motion for compassionate release, a district court may consider the amount of

time remaining on a defendant's sentence). On this point, the Third Circuit has made the following observations:

> We have not previously considered whether a district court abuses its discretion by denying a motion for compassionate release based on the amount of time remaining to be served in the inmate's sentence. But numerous district courts have taken this into account in considering whether to grant compassionate release. *See, e.g.*, *United States v. Bogdanoff*, 459 F. Supp. 3d 653 (E.D. Pa. May 8, 2020) (denying compassionate release where the inmate had served only seven years of an 18-year sentence, and noting that the case was "much different than others where defendants [sought compassionate release] at the end of their sentence"); *United States v. Moskop*, No. 11-cr-30077, 2020 WL 1862636, at *1–2 (S.D. Ill. Apr. 14, 2020) (denying compassionate release where the inmate had served less than 10 years of a 20-year sentence and explaining that the "sentencing objectives of specific deterrence and protecting the public [would] not [be] fully served by less than 10 years of incarceration"). And at least one of our sister circuits has approved that consideration. *See* [*United States v.*] *Chambliss*, 948 F.3d [694 (6th Cir. 2020) (holding that a district court did not abuse its discretion in denying compassionate release based, in part, on the defendant's having served only 14 years of a 30-year sentence). We agree, as this consideration is consistent with the text of 18 U.S.C. § 3582(c)(1)(A), which, again, requires a court reviewing a motion for compassionate release to "consider[ ] the factors set forth in [§] 3553(a) to the extent that they are applicable." Because a defendant's sentence reflects the sentencing judge's view of the § 3553(a) factors at the time of sentencing, the time remaining in that sentence may—along with the circumstances underlying the motion for compassionate release and the need to avoid unwarranted disparities among similarly situated inmates—inform whether immediate release would be consistent with those factors. Hence we cannot conclude that the District Court acted unreasonably in determining that the substantial sentencing reduction required for granting compassionate release here—a reduction from 15 years to less than two years—would be inconsistent with the § 3553(a) factors.

*Id.* at 330-31 (footnotes omitted).

## IV. CONCLUSION

For the foregoing reasons, the Court denies Defendant's motion. An appropriate Order accompanies this Opinion.

Dated: January 12, 2021

                                                                                    
John Michael Vazquez, U.S.D.J.